Ray Lackey Enters., Inc. v. Vill. Inn Lakeside, Inc., 2016 NCBC 9.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>IREDELL COUNTY<br><br>RAY LACKEY ENTERPRISES, INC.<br>d/b/a VILLAGE INN PIZZA PARLOR,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>VILLAGE INN LAKESIDE, INC., and<br>VILLAGE INN OF JONESVILLE,<br>INC.,<br><br>　　　　　Defendants. | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>14 CVS 2599<br><br><br><br>ORDER AND OPINION ON<br>DEFENDANTS' MOTION TO ENFORCE<br>SETTLEMENT AGREEMENT AND<br>PLAINTIFF'S MOTION FOR CITATION<br>OF CIVIL CONTEMPT |

{1} **THIS MATTER** is before the Court upon (1) Defendants Village Inn Lakeside, Inc. ("Lakeside") and Village Inn of Jonesville, Inc.'s ("Jonesville") (collectively, "Defendants") Motion to Enforce Settlement Agreement (the "Motion to Enforce") and (2) Plaintiff Ray Lackey Enterprises, Inc. d/b/a Village Inn Pizza Parlor's ("Plaintiff" or "Ray Lackey") Motion for Citation of Civil Contempt (the "Contempt Motion") (collectively, the "Motions") in the above-captioned case.

{2} The Court, having considered the Motions, the briefs, the affidavits, other submissions of counsel, appropriate matters of record, and the arguments of counsel as discussed *infra*, hereby **DENIES** the Motion to Enforce and **GRANTS** the Contempt Motion.

> *Parker Poe Adams & Bernstein LLP, by Michael G. Adams and John D. Branson, for Plaintiff Ray Lackey Enterprises, Inc. d/b/a Village Inn Pizza Parlor.*
>
> *Homesley, Gaines, Dudley & Clodfelter, LLP, by Edmund L. Gaines and Christina Clodfelter, and Moore & Van Allen, PLLC, by Kathryn G. Cole, for Defendants Village Inn Lakeside, Inc. and Village Inn of Jonesville, Inc.*

Bledsoe, Judge.

I.

BACKGROUND

{3}     This case involves claims for state trademark infringement and unfair and deceptive trade practices.  The underlying facts of the case are discussed in more detail in *Ray Lackey Enters. v. Vill. Inn Lakeside, Inc.*, 2015 NCBC LEXIS 35 (N.C. Super. Ct. Apr. 2, 2015).

{4}     Plaintiff Ray Lackey owns and operates several family-run pizza restaurants under the Village Inn Pizza Parlor brand name.  It also licenses the use of its trademarks to other affiliated but independently-owned restaurants.  *Id.* at *2–3.

{5}     On April 2, 2015, the Court issued a preliminary injunction order (the "Preliminary Injunction" or "Preliminary Injunction Order") enjoining Defendants, whose principals were formerly Ray Lackey employees and officers, from, *inter alia*, using Plaintiff's name, registered marks, phrases, and "affirmatively asserting that Defendants' business originated from, or is affiliated in any manner with Plaintiff." *Id.* at *29.[1]  Approximately one month after the Preliminary Injunction issued, the parties participated in a mediated settlement conference that initially appeared

---

[1] Defendants filed a notice of appeal of the Court's Preliminary Injunction Order on May 1, 2015.  N.C. Gen. Stat § 1-294 provides that "[w]hen an appeal is perfected as provided by [Article 27] it stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein, unless otherwise provided by the Rules of Appellate Procedure . . . ."  Our courts have made clear that "[a]n appeal is not 'perfected' until it is docketed in the appellate court . . . ." *Romulus v. Romulus*, 216 N.C. App. 28, 33, 715 S.E.2d 889, 892 (2011); *see, e.g., Reid v. Town of Madison*, 145 N.C. App. 146, 149, 550 S.E.2d 826, 828 (2001) ("For purposes of G.S. § 1-294, an appeal is perfected when it is docketed in the appellate division.").  Under N.C. R. App. P. 12, an appeal has been docketed when the record on appeal and docketing fee have been received in the Court of Appeals.  *See, e.g., Watson v. Watson*, 118 N.C. App. 534, 539, 455 S.E.2d 866, 869 (1995) ("Pursuant to Rule 12(b) of our appellate rules, an appeal is docketed upon the time of filing the record on appeal.").  It is undisputed that Defendants did not tender a proposed record on appeal to Plaintiff; and as a result, a record on appeal was not received in the appellate court, and thus the appeal was neither docketed nor perfected. The Court therefore concludes that N.C. Gen. Stat. § 1-294 does not divest the trial court of jurisdiction to consider the Motion to Enforce.  *See generally Richardson v. Bingham*, 101 N.C. App. 687, 688, 400 S.E.2d 757, 758 (1991) (dismissing appeal for failure to follow appellate rules, including Rule 12 requirement to timely file proposed record on appeal); *McGinnis v. McGinnis*, 44 N.C. App. 381, 385, 261 S.E.2d 491, 494 (1980) ("As a general rule, an appeal takes a case out of the jurisdiction of the trial court.  Thereafter, pending the appeal, the judge is *functus officio*.  However, this rule does not apply where further proceedings in the trial court indicate that the appeal has been abandoned.") (quotations and citations omitted).

successful. The subsequent negotiations broke down before the parties could execute final settlement documents.

{6}    Defendants filed the Motion to Enforce on July 14, 2015, seeking enforcement of a settlement agreement that they contend was entered into on May 5, 2015. Less than two weeks later, Plaintiff filed a Motion for Citation of Civil Contempt in response, arguing that Defendants are in willful violation of the Preliminary Injunction.

{7}    The Court held an initial hearing on the Motions on September 17, 2015. Following the hearing, the Court deferred ruling on the Motions and ordered the parties to submit a more complete record of counsel's written communications relating to the settlement negotiations. (Scheduling Order, Sept. 21, 2015.) The Court ordered supplemental briefing and held another hearing on the Motions on January 6, 2016. The Motions are now ripe for consideration.

II.

MOTION TO ENFORCE SETTLEMENT AGREEMENT

A. Factual Background

{8}    The parties engaged in a mediated settlement conference on May 5, 2015, shortly after this Court entered the Preliminary Injunction. (Defs.' Br. Supp. Mot. Enforce Settl. Agr. 1.) At the conclusion of the mediation, the parties executed a mediated settlement document in the form of a term sheet, to which all counsel affixed their signatures. (Pl.'s Br. Opp. Mot. Enforce Settl. Agr. Ex. A, hereinafter "May 5 Term Sheet.") The document begins by stating, "Below outlines the terms of a proposed settlement structure, all of which is subject to signed definitive agreements." (May 5 Term Sheet.) One week later, the mediator submitted to the Court a form Report of Mediator, in which he reported that the parties reached an "agreement on all issues." (Defs.' Br. Supp. Mot. Enforce Settl. Agr. Ex. A.)

{9}    Under the "proposed settlement structure" of the May 5 Term Sheet, the finalized settlement would include a consent permanent injunction based upon the Court's preliminary injunction, (May 5 Term Sheet ¶¶ 8–9), a confidentiality

agreement, (May 5 Term Sheet ¶ 14), and the settlement agreement itself, to reflect the other enumerated terms. (May 5 Term Sheet ¶ 15.)

{10} Counsel subsequently began exchanging drafts of the settlement documents and further negotiating the documents' terms over e-mail. During this process, Plaintiff contends that it repeatedly discovered conduct that it believed constituted a breach of the Preliminary Injunction, and Plaintiff asserts that it notified Defendants of these incidents. Negotiations as to the form of the settlement documents essentially concluded on June 25, 2015, when Plaintiff's counsel circulated drafts described as the "final agreed to settlement documents." (Pl.'s Br. Opp. Mot. Enforce Settl. Agr. 3.) Between June 25 and July 2, 2015, counsel worked through additional changes to the documents while contemplating their execution.

{11} On July 2, 2015, Plaintiff requested a phone call with Defendants to discuss the alleged Preliminary Injunction violations. (E-mail Correspondence Among Counsel, filed Sept. 25, 2015, hereinafter "Counsel E-mail," No. 40.) The parties' attempts to finalize and execute the settlement documents subsequently failed, and Plaintiff definitively stated to Defendants on July 13, 2015 that "[t]he proposed agreements you have sent are not acceptable to [Ray Lackey] and will not be executed. Among other reasons, [Ray Lackey] is unwilling to release your clients' conduct in repeatedly violating the [P]reliminary [I]njunction." (Counsel E-mail No. 55.) Defendants filed the Motion to Enforce the next day, on July 14, 2015.

B. Standard of Review

{12} When a party seeks to enforce a settlement agreement by filing a motion in the original action, the Court applies the summary judgment standard of review. *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009). In order to prevail, the moving party bears the burden of demonstrating that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Id.* The Court views the evidence in the light most favorable to the non-moving party. *Id.*

C. Analysis

1. The May 5 Term Sheet

{13} Our state's Supreme Court has stated that "compromise agreements, such as the mediated settlement agreement reached by the parties in this case, are governed by general principles of contract law." *Chappell v. Roth*, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001) (citation omitted). A settlement agreement constitutes a valid contract if the parties have reached a meeting of the minds on all terms, for "[i]f any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." *Id.* (quoting *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)). While our courts encourage the use of, and give great deference to, mediated settlements as a means of dispute resolution, the consensual nature of any settlement prohibits this Court from compelling compliance with "terms not agreed upon or expressed by the parties in the settlement agreement." *Id.*

{14} In *Chappel*, the Supreme Court held that a settlement agreement was not enforceable where the full terms of the settlement provided that the defendant would pay plaintiff $20,000 "in exchange for voluntary dismissal (with prejudice) and full and complete release, mutually agreeable to both parties." *Id.* at 691, 548 S.E.2d at 499–500. The Court held that the purported settlement agreement contemplated future agreement on the release as a material term, and the failure of that condition rendered the settlement agreement unenforceable. *Id.*

{15} In this case, all parties agree that the May 5 Term Sheet represents the agreement reached at the conclusion of the parties' mediated settlement conference. In challenging the Motion to Enforce, Plaintiff argues that the May 5 Term Sheet must fail because it is in essence an agreement to agree rather than a binding and enforceable contract. (Pl.'s Br. Opp. Mot. Enforce Settl. Agr. 2.) Our courts generally hold that contracts leaving material portions open for future agreement are "nugatory and void for indefiniteness" because there is no way for a court to interpret or enforce such a contract. *Boyce*, 285 N.C. at 734, 208 S.E.2d at 695. Therefore, "a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations." *Id.* (quotation

omitted).   Applying these principles here, the Court finds Plaintiff's argument persuasive.

{16}   The May 5 Term Sheet, which all parties executed, "outlines the terms of a proposed settlement structure, all of which is subject to signed definitive agreements." (May 5 Term Sheet.)  This language is significant, because the "writing itself shows its incompleteness by emphasizing its preliminary character.   It expresses the desires of the parties but not the agreement of both." *Boyce*, 285 N.C. at 734, 208 S.E.2d at 695; *Housing, Inc. v. Weaver*, 305 N.C. 428, 444, 290 S.E.2d 642, 652 (1982) (applying *Boyce* and finding a purported settlement agreement unenforceable where the documents "recited on their face that they were preliminary agreements subject to more definitive agreements to be executed subsequently").  In addition to this introductory language, the May 5 Term Sheet specifically contemplates that further negotiations will occur by including in its enumerated provisions a term that "[s]ettlement documents to be prepared and must be acceptable to all parties." (May 5 Term Sheet ¶ 15.)

{17}   Defendants cite this Court's (Gale, J.) decision in *DeCristoforo v. Givens*, 2015 NCBC LEXIS 56 (N.C. Super. Ct. May 29, 2015), to argue that settlement agreements may be enforced even when the parties fail to agree on and execute more comprehensive settlement documents.  (Defs.' Br. Supp. Mot. Enforce Settl. Agr. 5–6.)  *DeCristoforo* is distinguishable from the present case, however.  At the conclusion of the mediated settlement conference in that case, the parties signed a mediation form and an attached exhibit, which stated that "a full and final agreement of all issues was reached," and that "the parties hereby agree to the following terms, contemplating a further statement of their agreement and complete mutual release." *Id.* at *11–13.  The Court enforced the settlement agreement because the language of these two signed documents "expresses a clear intent that all issues in the litigation had been fully and fairly resolved." *Id.* at *30.

{18}   In this case, however, the parties did not sign the form Report of Mediator or any other document expressing a full and final agreement.[2]  While the Report of Mediator did indicate that the parties reached a final agreement, the parties executed only the May 5 Term Sheet "outlin[ing] the terms of a proposed settlement structure," the four corners of which do not evince clear intent that all issues were resolved.  In fact, the May 5 Term Sheet only uses the word "agree" or "agreement" in connection with future events and documents yet to be drafted:

- " . . . subject to signed definitive agreements" (May 5 Term Sheet);
- " . . . [Ray Lackey] must agree that the items are her personal items" (May 5 Term Sheet ¶ 6);
- " . . . subject to confidentiality agreement that prohibits third party disclosure." (May 5 Term Sheet ¶ 16.)

{19}   Furthermore, the parties' conduct after the mediated settlement conference indicates that material aspects of the May 5 Term Sheet required further negotiation, thus making it void for indefiniteness.  *See Crowder Constr. Co. v. Kiser*, 134 N.C. App. 190, 201, 517 S.E.2d 178, 186 (1999) (stating that the court may consider the manner in which parties have performed subsequent to contract execution in order to determine the parties' intent).  For example, between June 15, 2015 and June 25, 2015, the parties aggressively negotiated a clause on inspection rights.  (Counsel E-mail Nos. 23–34.)  Defendants initially objected to a stipulation that they waive their future inspection rights, (Counsel E-mail No. 23), which Plaintiff did not want to remove as it considered the waiver "a material benefit of the bargain."  (Counsel E-mail No. 27.)  Additionally, the May 5 Term Sheet's provision that "settlement documents to be prepared and must be acceptable to all parties" lacks the specificity necessary for the Court to enforce it.  *See Boyce*, 285 N.C. at 734, 208 S.E.2d at 695

---

[2] In *DeCristoforo*, the parties signed form AOC-DRC-16T, entitled "Mediated Settlement Agreement," which is intended to memorialize the terms of the full and final agreement reached at mediation.  In this case, the parties implemented form AOC-CV-813, entitled "Report of Mediator in Superior Court Civil Action," whose purpose is primarily to discharge the mediator's duty to report to the court pursuant to Rule 6.B(4) of the Rules Implementing Statewide Mediated Settlement Conferences and Other Settlement Procedures in Superior Court Civil Actions. The executed May 5 Term Sheet was not a form document and was independently drafted.

(stating that a contract leaving portions open for future agreement may be void when the Court cannot determine what sort of contract would result from the negotiations or what damages would flow from a failure to enter into the contract).

{20} Because the parties failed to enter into "signed definitive agreements" as contemplated, and because the May 5 Term Sheet left open material terms for further negotiations, the Court concludes that the May 5 Term Sheet was not a binding and enforceable contract.

2. The June 25th to July 2nd E-mails

{21} Defendants alternatively argue that if the May 5 Term Sheet is not an enforceable agreement, the parties nevertheless reached a full agreement through counsel's subsequent communications. All parties agree that negotiations as to the form of the settlement agreements essentially concluded on June 25, 2015, when Plaintiff's counsel circulated unsigned documents described as the "final agreed to settlement documents." (Pl.'s Br. Opp. Mot. Enforce Settl. Agr. 3.) The question before the Court is whether, under basic contract formation principles of offer and acceptance, the parties formed a binding contract through their subsequent communications.

{22} As to the creation of a binding contract, our courts have stated:

> In the formation of a contract an offer and an acceptance are essential elements; they constitute the agreement of the parties. The offer must be communicated, must be complete, and must be accepted in its exact terms. Mutuality of agreement is indispensable; the parties must assent to the same thing in the same sense, *idem re et sensu*, and their minds must meet as to all the terms.

*Washington v. Traffic Markings, Inc.*, 182 N.C. App. 691, 697, 643 S.E.2d 44, 48 (2007) (quoting *Dodds v. Trust Co.*, 205 N.C. 153, 156, 170 S.E. 652, 653 (1933)). In order to assess Defendants' argument, the Court will discuss the instances of offer and acceptance as they occurred in counsel's communications.

{23} On June 25, 2015, Plaintiff's counsel tendered an offer of "a draft of the confidentiality agreement and the final agreed to settlement documents." (Counsel E-mail No. 36.) Defendants responded on June 26, 2015 by submitting a redlined

version of the confidentiality agreement and accepting the other documents, (Counsel E-mail No. 37), which amounts to a counteroffer. *Normile v. Miller*, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985) (stating that an acceptance that purports to alter the terms of an offer is a counteroffer, which amounts to a rejection of the original offer). After receiving no response from Plaintiff, Defendants checked in with Plaintiff twice and noted that it "[s]eems like we could be in a position to get these documents executed this week." (Counsel E-mail Nos. 38–39.)

{24} On July 2, 2015, Plaintiff finally responded to Defendants' offer by requesting a phone call to discuss perceived violations of the Preliminary Injunction, which, Plaintiff wrote, "are obviously quite troubling to Ray Lackey Enterprises and are making it difficult for us to resolve these documents." (Counsel E-mail No. 40.) Defendants agreed to find a time to discuss these issues, and, in order to move forward with the settlement documents, asked Plaintiff to "let us hear from you in response to the requested revisions to the confidentiality agreement sent via e-mail last Friday, June 26." (Counsel E-mail No. 41.) Shortly thereafter, Plaintiff responded by saying, "The revisions to the confidentiality agreement are fine with us. Talk to you next week . . . ." (Counsel E-mail No. 42.) It is this e-mail—E-mail No. 42—that Defendants contend constituted full acceptance of the settlement documents submitted in their June 26 counteroffer.

{25} After receiving E-mail No. 42, Defendants continued to pursue execution of the documents, and Plaintiff continued to insist that the alleged violations of the Preliminary Injunction would prevent it from executing the documents. On July 10, 2015, Defendants signed the settlement documents and delivered them to Plaintiff, (Counsel E-mail No. 54), who responded by stating that the "proposed agreements you have sent are not acceptable to [Ray Lackey] and will not be executed" because of Defendants' alleged conduct in violation of the Preliminary Injunction. (Counsel E-mail No. 55.)

{26} Plaintiff contends, and the Court agrees, that counsel's e-mail communications never gave rise to a binding contract. Both the May 5 Term Sheet and counsel's correspondence indicate that the parties recognized that the documents

required execution to take effect. "When negotiating parties make it clear that they do not intend to be bound by a contract until a formal written agreement is executed, no contract exists until that time." *Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007) (citation omitted). The parties began drafting the settlement documents pursuant to the May 5 Term Sheet, "subject to signed definitive agreements." *In re Foreclosure of Goforth Properties, Inc.*, 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993) (including "subject to" in a list of language commonly used to make an event a condition).

{27} Although the Court has concluded that the May 5 Term Sheet was void, the parties' e-mail communications repeatedly affirm the existence of this condition throughout their negotiations:

- "We will proceed [to transfer funds] as agreed to in the settlement, when we have an executed settlement agreement," (Counsel E-mail No. 11);

- "Our clients will proceed with the execution of the settlement agreement with the [following revisions and additions]," (Counsel E-mail No. 34);

- "Please let me know where we stand on the confidentiality agreement. Seems like we could be in a position to get these documents executed this week," (Counsel E-mail No. 38);

- "We are happy to discuss any issues that have arisen. However, we also need to move forward with getting the settlement documents completed." (Counsel E-mail No. 41.)

Thus, each party's counsel repeatedly affirmed the May 5 Term Sheet's signed writing condition throughout the negotiation process. Therefore, the Court concludes that failure of this condition prevented the parties' subsequent negotiations from giving rise to a binding contract.[3]

---

[3] Defendants argue that any statements regarding the execution of the agreement should not be considered because the purported settlement agreement contained an "Entire Agreement" clause superseding prior negotiations. (Defs.' Br. Supp. Mot. Enforce Settl. Agr. Ex. I ¶ 26.) That provision, however, never became effective. The document's "Effective Date" clause states that the agreement shall take effect upon the entry of an order approving the Consent Permanent Injunction, which never occurred. (Defs.' Br. Supp. Mot. Enforce Settl. Agr. Ex. I ¶ 20.)

{28}  Furthermore, setting aside the issue of execution, the Court does not believe that counsel's communications up through E-mail No. 42 reflect the "mutuality of agreement" required for a binding agreement.  Plaintiff originally voiced concern on May 19, 2015 over conduct that would "undermine the settlement agreement, or prevent its anticipated execution." (Counsel E-mail No. 4.)  On the morning of July 2, 2015, Plaintiff requested a phone call with Defendants after notifying them again that "[s]everal issues have arisen which constitute violations of the preliminary injunction and are obviously quite troubling to Ray Lackey Enterprises and are making it difficult for us to resolve these documents." (Counsel E-mail No. 40.) Plaintiff had earlier made clear that the injunction was, for Plaintiff, "*the* material term of the settlement," (Counsel E-mail No. 20), and E-mail No. 42 was sent in the midst of the parties' efforts to schedule a conversation about Defendants' alleged conduct  in violation of the Court's Order.

{29}  The Court concludes that Plaintiff clearly communicated its unwillingness to go forward without resolution of these issues, and so counsel's statement that "[t]he revisions to the confidentiality agreement are fine with us.  Talk to you next week . . ." does not indicate that the parties assented to the same thing in the same sense. Plaintiff's words and acts, taken as a whole, contemplated future substantive communications before agreeing to be bound.  *Howell v. Smith*, 258 N.C. 150, 153, 128 S.E.2d 144, 146 (1962) (stating that the Court evaluates mutual assent by looking to a party's "words or acts, judged by a reasonable standard").  Indeed, Plaintiff explicitly confirmed its position just three hours after sending E-mail No. 42, telling Defendants "we need to have a good faith conversation about the issues [Plaintiff's counsel] mentioned next Monday before either party can move forward to execute these documents." (Counsel E-mail No. 45.)

D.  Conclusion

{30}  In sum, the Court concludes that there is not a binding settlement agreement among the parties.  The May 5 Term Sheet was not a binding agreement but merely a void agreement to agree.  Counsel's subsequent e-mail communications did not give rise to a binding agreement because the parties continued to negotiate

under the condition of "signed definitive agreements," and there was no meeting of the minds prior to the breakdown of negotiations. Because the Court so concludes, the Court need not consider Plaintiff's alternative argument that, in the event the settlement agreement is enforceable, Plaintiff is entitled to rescission because Defendants' conduct is a material breach of the agreement.

{31} **WHEREFORE**, the Court hereby **DENIES** Defendants' Motion to Enforce and **ORDERS** the parties to meet and confer and thereafter file a revised Case Management Report with a proposed Case Management Order no later than February 23, 2016.

III.

MOTION FOR CITATION OF CIVIL CONTEMPT

{32} Independent of its resolution of the Motion to Enforce, the Court next proceeds with consideration of Plaintiff's Contempt Motion. Plaintiff moves the Court to enter an order holding Defendants in civil contempt for willfully violating the Preliminary Injunction Order. Specifically, Plaintiff requests that the Court order Defendants to comply with the Preliminary Injunction Order, to purge themselves of contempt by "chang[ing] their tradename and adopt[ing] a name that is not confusingly similar or reminiscent of the Plaintiff's," and to pay Plaintiff's reasonable attorney's fees in connection with the Contempt Motion. (Pl.'s Mot. Citation Civil Contempt 3.) The Court **FINDS** and **CONCLUDES** as follows.

A. <u>Standard of Review</u>

{33} "Proceedings for civil contempt may be initiated by motion of an aggrieved party giving notice to the alleged contemnor to appear before the court for a hearing on whether the alleged contemnor should be held in civil contempt." N.C. Gen. Stat. § 5A-23(a1) (2015). "The burden of proof in a hearing pursuant to this subsection shall be on the aggrieved party." *Id.* In a civil contempt proceeding, the judicial official is the trier of fact. N.C. Gen. Stat. § 5A-23(d). When civil contempt is found, the judicial official must enter an order finding the facts supporting each element of civil contempt and specifying the action by which the contemnor can purge himself or herself of contempt. N.C. Gen. Stat. § 5A-23(e).

{34} Civil contempt is defined by our statutes as follows:

(a) Failure to comply with an order of a court is a continuing civil contempt as long as:

(1) The order remains in force;
(2) The purpose of the order may still be served by compliance with the order;
(2a) The noncompliance by the person to whom the order is directed is willful; and
(3) The person to whom the order is directed is able to comply with the order or is able to take reasonable measures that would enable the person to comply with the order.

N.C. Gen. Stat. § 5A-21(a) (2015). Noncompliance with a court order is willful when it involves "either a positive action (a 'purposeful and deliberate act') in violation of a court order or a stubborn refusal to obey a court order (acting 'with knowledge and stubborn resistance')." *Hancock v. Hancock*, 122 N.C. App. 518, 525, 471 S.E.2d 415, 419 (1996).

{35} "Civil contempt is a term applied where the proceeding is had to preserve the rights of private parties and to compel obedience to orders and decrees made for the benefit of such parties." *O'Briant v. O'Briant*, 313 N.C. 432, 434, 329 S.E.2d 370, 372 (1985). The Court's only means of compelling the compliance of a person found in civil contempt is imprisonment as long as the civil contempt continues, subject to certain time limitations. N.C. Gen. Stat. § 5A-21(b). A court order holding a person in civil contempt must specify how the person may purge the contempt, and imprisonment must end once the person has purged herself of contempt. N.C. Gen. Stat. §§ 5A-22(a), 23(e). *See also Cox v. Cox*, 133 N.C. App. 221, 226, 515 S.E.2d 61, 65 (1999) (stating that a purge provision must clearly specify what the defendant can and cannot do to purge herself of contempt). Because civil contempt seeks to coerce compliance rather than to punish, the purge provision is essential to a civil contempt order. *Bethea v. McDonald*, 70 N.C. App. 566, 570, 320 S.E.2d 690, 693 (1984) (citing *Jolly v. Wright*, 300 N.C. 83, 265 S.E.2d 135 (1980)).

B. Findings of Fact

   1. N.C. Gen. Stat. § 5A-21(a)(1)–(2)

{36} The Preliminary Injunction Order is still in effect and thus remains in force. It was entered pending final resolution or other order of the Court, (Preliminary Injunction Order ¶ 67), and the Court has not entered any orders dissolving the Preliminary Injunction.

{37} In entering the Preliminary Injunction, the Court found and concluded that Defendants' intentional infringement on Ray Lackey's registered trademarks and common-law marks ("Marks") had caused and would continue to cause both consumer confusion and irreparable harm to Ray Lackey's business. (Preliminary Injunction Order ¶¶ 64–65.) The Court finds that compliance with the Preliminary Injunction Order will serve the Order's purpose of preventing consumer confusion and harm to Plaintiff's business.

   2. N.C. Gen. Stat. § 5A-21(a)(3)

{38} Defendants have the present ability to comply with the Preliminary Injunction Order, because the Preliminary Injunction merely ordered Defendants to refrain from a particular course of conduct, which the Court finds was and is completely within Defendants' ability and control to accomplish.

{39} The Preliminary Injunction found that William Ray Lackey, Sr. had founded the Village Inn Pizza Parlor brand in 1967. (Preliminary Injunction Order ¶ 6.) The Order further found that Ray Lackey had common-law trademark rights in the phrase "Family Owned Business Since 1967." (Preliminary Injunction Order ¶ 8.)

{40} The Preliminary Injunction specifically ordered Defendants to:

- Cease using the name "Village Inn" or "Village Inn Pizza Parlor," (Preliminary Injunction Order ¶ 67(b));

- Cease using the phrase "Family Owned and Operated Since 1967," (Preliminary Injunction Order ¶ 67(d)(iii));

- Cease and refrain from "affirmatively asserting that Defendants' business originated from, or is affiliated in any manner with Plaintiff," (Preliminary Injunction Order ¶ 67(e)); and

- Destroy or store out of site any signage or other materials that contain any of Ray Lackey's Marks. (Preliminary Injunction Order ¶ 67(g).)

3. <u>N.C. Gen. Stat. § 5A-21(2a)</u>

  a. <u>Sixty Seven Pizza Co</u>

{41} After the entry of the Preliminary Injunction Order on April 2, 2015, Defendants stopped using "Village Inn" in their name and, on April 6, 2015, began operating as "67 Pizza Company" or "Sixty Seven Pizza Company."[4] Elizabeth Lackey Miller ("Ms. Miller"), one of the Defendants' four stockholders, has stated that the Jonesville restaurant's location on Highway 67 inspired the new name. (Miller 3d Aff. ¶ 3.) To support this claim, Ms. Miller swore, in an affidavit dated August 20, 2015, that Sixty Seven Pizza Company "has used" as its logo a highway sign containing the number sixty-seven. (Miller 3d Aff. ¶ 6.) The highway sign logo is attached to this order as Appendix A.

{42} Plaintiff presented evidence that Defendants quickly abandoned the highway sign logo in favor of a logo using an apostrophe before the number sixty-seven (i.e., '67) to denote the year 1967. (Pl.'s Reply to Mot. Citation Civil Contempt 2–3.) The Court attaches to this Order as Appendix B various depictions of the current logo used by Defendants. In a fourth affidavit, Ms. Miller explained that the highway sign logo was chosen immediately after the issuance of the injunction and was used for only ten days, between April 6 and April 16, 2015. (Miller 4th Aff. ¶ 4.) Defendants began using the current logo, which employs an apostrophe, on April 16, 2015, months before Ms. Miller swore out her third affidavit that omits any reference to this new logo. (Miller 4th Aff. ¶ 8.)

{43} Additionally, Ms. Miller's third affidavit states, in present tense, that Defendants' menus display the highway sign logo, (Miller 3d Aff. ¶ 8), although she later admits that menus displaying the new '67 logo were in use on April 16, 2015.

---

[4] Defendants argue that Plaintiff waived any opportunity to object to this name by waiting to bring the Contempt Motion four months after the name change. Plaintiff states that it did not object initially because it lacked evidence that Defendants were affirmatively attempting to associate the number sixty-seven with 1967. Plaintiff asserts that after uncovering additional violations and further evidence, Plaintiff decided to bring the Contempt Motion.

(Miller 4th Aff. ¶ 10.) She further states that napkin holders with the highway sign logo "were placed in the restaurants on April 6, 2015," (Miller 3d Aff. ¶ 9), but admits in her fourth affidavit that the napkin holder inserts with the current '67 logo were in use on April 16, 2015. (Miller 4th Aff. ¶ 11.) Therefore, when Ms. Miller swore out her third affidavit, on which Defendants' response brief relied heavily, and which failed to mention that Defendants had already abandoned the highway sign logo in favor of the new '67 logo, Ms. Miller at the very least omitted to tell the Court the full truth and at worst sought to deceive the Court concerning Defendants' current use of the '67 logo.

{44} The various iterations of the current '67 logo spell out the word "Sixty Seven" and portray a pizza slice, turned sideways and in some instances dotting the "i" in "Sixty." (Miller 4th Aff. Ex. B, attached to this Order as Appendix A.) The negative space within the pizza slice depicts an apostrophe and sixty-seven in numeral form— '67. (Miller 4th Aff. Ex. B.)

{45} The Court's finding that this image depicts an apostrophe is supported by Defendants' typed use of '67 elsewhere in their restaurants. A Lakeside menu submitted to the Court, which Defendants represent as being in use on April 6, 2015, contains section headings for "Rockin '67 Wings," "'67 Pizza Favorites," and "Build Your Own '67." (Miller 3d Aff. ¶ 4, Ex. C.)

{46} The Court finds that the use of the number sixty-seven with an apostrophe clearly invokes the year 1967. At the hearing, Defendants' counsel agreed that consumers could view the image in the new logo as containing an apostrophe before the number 67. Defendants' counsel likewise acknowledged that consumers could understand '67 to mean 1967.

{47} The Court further finds that the use by Defendants of '67 is an attempt to "affirmatively assert[] that Defendants' business originated from, or is affiliated . . . with Plaintiff," whose rights in the phrase "Family Owned and Operated Since 1967" were acknowledged in the Preliminary Injunction Order. One week before the Preliminary Injunction was entered, Ms. Miller was quoted in an Elkin Tribune article about the opening of the Jonesville location stating that "[w]e still do

everything the same as in '67."[5]  (Pl.'s Mot. Citation Civil Contempt, Miles Lackey Aff. Ex. F.)  Long after the entry of the Preliminary Injunction, on August 13, 2015, an employee at Defendants' Lakeside restaurant stated to an investigator hired by Plaintiff and acting as a customer:

> But it's basically family agreed why this place can't be named Village Inn Lakeside [sic] that's where the 67 comes in, that was the year the Village Inn was founded. . . . It's kind of secretly saying it's the Village Inn, we can't have anything to do with the name but it's still the exact same pizza and salad bar.

(Pl.'s Reply to Mot. Citation Civil Contempt, Davis Martin Aff. Ex. 1.)

{48}  In light of the substantial evidence outlined above, and Ms. Miller's lack of candor in advising the Court of the actual use of the '67 logo in Defendants' restaurants, the Court finds that Defendants' use of '67 is a purposeful and deliberate, and therefore willful, violation of Paragraph 67(e) of the Preliminary Injunction Order.

       b.  Other Violations

{49}  Defendants have violated the terms of the Preliminary Injunction in numerous other ways.  Defendants' Lakeside location sold gift certificates bearing Plaintiff's Marks, and its employees had scratched through the words "Village Inn," seemingly in an effort to comply with the Preliminary Injunction Order.  (Pl.'s Mem. Supp. Mot. Citation Civil Contempt 3–4.)  Two of these gift certificates were purchased from the Lakeside location and presented for redemption at Plaintiff's Village Inn Pizza Parlors.  The first was sold by Defendants on May 5, 2015, over a month after the Preliminary Injunction issued, (Phelps Aff. ¶ 5), and the second was sold on July 8, 2015, over three months later.  (Pl.'s Mot. Citation Civil Contempt, Miles Lackey Aff. Ex. D.)  The sequential numbering on the gift certificates indicates

---

[5] Although this statement was made prior to the issuance of the Preliminary Injunction, the Court finds that it still speaks to Defendants' motivation in choosing the new name.  The Elkin Tribune article is dated March 25, 2015.  (Pl.'s Mot. Citation Civil Contempt, Miles Lackey Aff. Ex. F.)  On March 24, 2015, Defendants performed a trademark search on variations of the phrase Sixty Seven Pizza.  (Cole Aff. ¶ 2.)  The Court therefore finds that Defendants were contemplating the name Sixty Seven Pizza around the same time Ms. Miller made the statement that "[w]e still do everything the same as in '67."

that the Lakeside location sold twenty-one gift certificates over this two-month period.  The existence of these gift certificates in Defendants' restaurant shows that Defendants failed to "destroy or store out of site" materials containing any of Ray Lackey's Marks as required under the Preliminary Injunction.   (Preliminary Injunction Order ¶ 67(g).)

{50}   Defendants do not dispute these facts and instead argue that this violation of Preliminary Injunction was inadvertent but not willful.  (Defs.' Resp. to Mot. Citation Civil Contempt 9–10; Caldwell Second Aff. ¶ 9–11.)  The Court is skeptical of this argument, as Defendants' employees appeared to know the terms of the Preliminary Injunction Order well enough to cross out the phrase "Village Inn." Furthermore, the gift certificates were not the only materials of Plaintiff's that Defendants failed to destroy or remove.  On August 13, 2015, four months after the entry of the Preliminary Injunction, Plaintiff's investigator observed an order sheet reading "Village Inn Pizza Parlor" next to the cash register, in the customers' line of sight, at the Jonesville restaurant.  (Davis Martin Aff. ¶ 4, Ex. 2.)  At the hearing, Defendants asserted that they have conducted subsequent searches of their facilities to ensure that they no longer possess any materials containing Ray Lackey's Marks, including order sheets.

{51}   Plaintiff has also complained of third-party advertisements on Facebook for an event that included a dinner at the Lakeside restaurant, which the advertisement referred to as "Village Inn Pizza Parlor."  (Pl.'s Mem. Supp. Mot. Citation Civil Contempt 3.)  Defendants assert that they have requested the removal of this advertisement and argue that they cannot be in willful noncompliance of the injunction on the basis of a third-party's actions.

{52}  The Village Inn Pizza name continues to appear in conjunction with Defendants' operations in various other settings.  As late as December 2015, the Village Inn Pizza name appeared on Defendants' employees' paychecks.  (Acuff Aff. ¶ 5, Ex. 4.)  At the same time, electronic bank statements of customers who used credit cards at Sixty Seven Pizza's new Marion location identified the location of the transaction as "Village Inn Pizza Inc."  (Acuff Aff. ¶ 4, Ex. 3.)  Plaintiff also offered

evidence that Defendants have not changed their name on all liquor licenses, (Pl.'s Mot. Citation Civil Contempt, Miles Lackey Aff. ¶ 9), which are displayed in the customer areas of Defendants' restaurants, and incorporation documents on file with the Secretary of State. (Acuff Aff. ¶ 2, Ex. 1.) Defendants have asserted that they are working to correct these official documents and electronic records.

{53} The Court finds that these other violations identified above have in fact occurred. Despite the excessive number of violations of this sort, which Plaintiff continued to uncover throughout the briefing and arguing of the Contempt Motion, the Court appreciates Defendants' arguments that many of these violations appear to be the result of inadvertence or third-party action and thus should not be found to have been made in willful disobedience of the Court's Preliminary Injunction under N.C. Gen. Stat. § 5A-21(a)(2a). As explained below, the Court does not, at this time, hold Defendants in civil contempt on the basis of these other violations.

C. Analysis

  1. Contempt

{54} The Court concludes that, on the basis of the facts found at paragraphs 36—48 of this Order and Opinion, that Defendants are in civil contempt of the Preliminary Injunction Order.

{55} As an initial matter, the Court notes that, because civil contempt seeks to compel compliance rather than to punish, a court may not impose civil contempt when an individual has complied, albeit belatedly, before the entry of contempt. *Ruth v. Ruth*, 158 N.C. App. 123, 126, 579 S.E.2d 909, 912 (2003). At the January 6 hearing, Defendants attested that they either have made or are making concerted efforts to correct the alleged minor violations uncovered by Plaintiffs. Plaintiffs in turn acknowledged that they are chiefly troubled by Defendants' use of the name Sixty Seven Pizza Co with its current logo. Therefore, the Court centers its decision, and the purge provision outlined below, around the issue of Defendants' name and logo.

{56} In crafting its purge provision, the Court concludes that it has the authority to hold Elizabeth Lackey Miller responsible for the corporate Defendants' contempt. Injunctions are binding "upon the parties to the action, their officers, agents,

servants, employees, and attorneys, and upon those persons in active concert of participation with them who receive actual notice in any matter of the order by personal service or otherwise." N.C. R. Civ. P. 65(d). Furthermore, our courts have held that "[a] command to [a] corporation is in effect a command to those who are officially responsible for the conduct of its affairs," and that if a responsible individual has notice of the court's order "prevent[s] compliance . . . they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt." *State ex rel. Grimsley v. West Lake Dev., Inc.*, 71 N.C. App. 779, 781–82, 323 S.E.2d 448, 449–50 (1984) (citing 17 Am. Jur. 2d, Contempt § 12, at 17–18). *See also Trotter v. Debnam*, 24 N.C. App. 356, 362, 210 S.E.2d 551, 555 (1975) (reversing finding of contempt where the contemnor was not a named party and not bound by the underlying injunction pursuant to Rule 65(d)).

{57} Elizabeth Lackey Miller is one of four stockholders of Sixty Seven Pizza Company, (Miller 4th Aff. ¶ 2), and she operates Defendants' restaurants and personally took steps to attempt to bring Defendants in compliance with the Preliminary Injunction Order. (Miller 4th Aff. ¶¶ 3, 5, 9.) Therefore, Ms. Miller had notice of the Preliminary Injunction Order, and the Court concludes that it has the authority to hold Ms. Miller in contempt for Defendants' willful violations of the Preliminary Injunction Order.

{58} The Court rejects Plaintiff's argument that this Order's purge provision should prohibit altogether Defendants' use of the name Sixty Seven Pizza Co. and the number sixty-seven, without an apostrophe, to break the association with the Village Inn brand that Defendants wrongfully sought to make. The Court does not find that the use of the number sixty-seven, in and of itself, with no apostrophe, is a willful violation of the Preliminary Injunction Order. This conclusion is consistent with Plaintiff's own actions in waiting several months, and participating in a settlement conference without objection, before complaining of Defendants' use of the name and the number sixty-seven.

2. Attorney's Fees

{59}   Plaintiff also asks the Court to award it attorney's fees in connection with the Contempt Motion.[6]  The Court declines to do so.  While the award of attorney's fees in civil contempt is well established in certain domestic actions, the law is unsettled as to their availability in other proceedings.  *Baxley v. Jackson*, 179 N.C. App. 635, 641, 634 S.E.2d 905, 909 (2006) ("We have found no cases approving an award of attorneys' fees in a civil contempt proceeding outside those arising in the context of enforcement of a child support or equitable distribution action.").

{60}   Our appellate courts have suggested that attorney's fees for civil contempt proceedings could be awarded outside of these domestic cases where there is express statutory authorization.  *See, e.g.*, *Moss Creek Homeowners Ass'n v. Bissette*, 202 N.C. App. 222, 234, 689 S.E.2d 180, 188 (2010) ("[T]he cases cited by appellees in defense of the fee award support our case law that outside of the family law field, statutory authority is required for enforcement of contempt. . . . Therefore, we reverse the [award of attorney's fees.]").

{61}   Plaintiff contends that there is express statutory authorization for an award of attorney's fees in this case.  The Preliminary Injunction enjoins Defendants based, in part, on Plaintiff's likelihood of success on the merits of its claims for trademark infringement under N.C. Gen. Stat. § 80-11.  Acts of trademark infringement are *per se* unfair and deceptive trade practices.  N.C. Gen. Stat. § 80-12 ("A violation of . . . G.S. 80-11 constitutes a violation of G.S. 75-1.1.").  N.C. Gen. Stat. § 75-16.1 expressly authorizes an award of attorney's fees for violations of Section 75-1.1.  Specifically, the statute gives the presiding judge the discretion to award attorney's fees to the "prevailing party" upon a finding that either the violating party acted willfully and

---

[6] The civil contempt statute was recently amended to add a provision that a person found in civil contempt is not subject to the imposition of a fine.  N.C. Gen. Stat. § 5A-21(d) (2016).  It does not appear to the Court, however, that this amendment would *per se* prohibit the award of attorney's fees in connection with a civil contempt motion.  While the Court has found no authority defining the word "fine" in Section 5A-21(d), Chapter 5A elsewhere includes a "fine not to exceed five hundred dollars," which is inherently different from an award of attorney's fees, as an appropriate punishment for criminal contempt.  N.C. Gen. Stat. § 5A-12.  Furthermore, there is a vast and well-supported body of case law allowing the award of attorney's fees in contempt proceedings for domestic cases.

with an unwarranted refusal to resolve the underlying matter or the party bringing the action knew the action was frivolous or malicious. N.C. Gen. Stat. § 75-16.1.

{62} The Court, in its discretion, declines to award attorney's fees because, although attorney's fees appear to be statutorily authorized for at least one of the claims on which the Preliminary Injunction Order was based, Section 75-16.1 requires findings beyond those the Court has made in entering the Preliminary Injunction or is otherwise prepared to make at this stage of the case. In particular, the Court is sympathetic to Defendants' arguments that they have not acted with an "unwarranted refusal to resolve" the matter when it is undisputed that the parties nearly resolved the case through lengthy settlement negotiations.

D. Conclusion

{63} **WHEREFORE**, the Court hereby **FINDS AND CONCLUDES** that Defendants are in civil contempt of Court under N.C. Gen. Stat. § 5A-21.

{64} Defendants may purge themselves of civil contempt by abandoning their present use of and refraining from future use of an apostrophe before the number sixty seven—'67—whether depicted in text or design, in association with their business. Specifically, Defendants must:

    A. Cease and refrain from using their present logo as depicted in Appendix B in association with their business;

    B. Cease and refrain from using '67 on menus, napkin holder inserts, and other printed materials used in association with their business; and

    C. Remove the current logo and '67 from their Facebook webpage and all other photographic material used in association with their business.

{65} If Defendants have not purged themselves of this contempt within forty-five (45) days of the entry of this Order, the Court will, pursuant to N.C. Gen. Stat. § 5A-21(b), order the imprisonment of Elizabeth Lackey Miller. Defendants may, however, seek to postpone the date for imprisonment by motion and for good cause shown.

{66} In the event that Defendants seek to purge themselves of contempt before the expiration of this forty-five day period, Defendants shall provide the Court with evidence of their compliance promptly. Plaintiff shall have five business days to

respond to Defendants' evidence, if so desired. The Court will withhold issuing an order for imprisonment until it has reviewed the parties' submissions and determined whether the conditions have been met to purge Defendants' civil contempt.

{67}   Plaintiff's request for attorney's fees is **DENIED**.

**SO ORDERED**, this the 29th day of January, 2016.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
  for Complex Business Cases



# Sixty Seven Pizza Company

Welcome to our new location, in our new town, with our new name serving our delicious pizza founded in over 100 years pizza experience.

## We look forward to serving you!

1744 Hwy. 67 Jonesville, NC

# 336- 526-4100



EXHIBIT

A

(Miller 3d Aff. Ex. A.)

Appendix B









**Supporting Font:**
SukhumvitSet-Thin



EXHIBIT

4B

(Miller 4th Aff. Ex. B.)